**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Sharon D. Robinson,                          Civil No. 05-582 (JMR/AJB)


                          Plaintiff,          **REPORT AND RECOMMENDATION**

v.

Jo Anne B. Barnhart, Commissioner
of Social Security,

                          Defendant.
_____

Fay E. Fishman, Esq., Peterson & Fishman, P.L.L.P., on behalf of plaintiff, Sharon D. Robinson.

Lonnie F. Bryan, Esq., Assistant United States Attorney on behalf of defendant, Jo Anne B. Barnhart, Commissioner of Social Security.
_____

## I.      INTRODUCTION

        Plaintiff Sharon D. Robinson (Ms. Robinson) appeals the unfavorable decision of the

Commissioner of Social Security Administration (Commissioner) denying her application for disability

insurance benefits (DIB).  This matter is before the Court, United States Magistrate Judge Arthur J.

Boylan, for a report and recommendation to the district court on the parties' cross-motions for

summary judgment.  See 28 U.S.C. § 636(b)(1) and Local Rule 72.1.  Based on the reasons set forth

below, this Court **recommends** that Ms. Robinson's Motion for Summary Judgment [Docket No. 6]

be **GRANTED** in part**,** and that the Commissioner's Motion for Summary Judgment [Docket No. 14]

be **DENIED**.

## II.     PROCEDURAL HISTORY

Ms. Robinson protectively filed her claim for DIB, under Title II of the Social Security Act, on

August 3, 2001, alleging that she became disabled on March 2, 2001.[1]  (Tr. 144-46.)  Her claims were

denied initially and upon reconsideration.  (Tr. 106-08, 111-14.)  Ms. Robinson requested and was

granted a hearing before an administrative law judge.  (Tr. 115-120.)  A hearing was held on March

19, 2004, before ALJ Roger W. Thomas.  (Tr. 18, 33.)  Ms. Robinson appeared at the hearing

represented by counsel, Fay E. Fishman, Esq.  (Tr. 33.)  Dr. John LaBree, testified as a neutral medical

expert and Mary Harris testified as a neutral vocational expert.  (Tr. 57, 65.)  On July 19, 2004, ALJ

Thomas issued his factual findings and decision denying the claim for DIB.  (Tr. 18-30.)  Ms. Robinson

filed a request for review, and on February 24, 2005, the Social Security Appeals Council denied her

request.  (Tr. 9-14.)  The decision of the ALJ thus became the final decision of the Commissioner.  See

42 U.S.C. § 405(g).  On March 17, 2005, Ms. Robinson commenced this action pursuant to 42

U.S.C. § 405(g).

## III.    FACTUAL BACKGROUND

### A.    Relevant Medical History

Ms. Robinson reported being first diagnosed with systemic lupus erythematosus[2] in 1992,

stating that most of her joints are involved along with ocular involvement but that there was no renal

---

[1]    Ms. Robinson previously filed an application for DIB on June 29, 1999, which was denied at the initial level.  No appeal was taken.  At the hearing relevant to this proceeding, Ms. Robinson moved to reopen her 1999 application.  (Tr. 37.)

[2]    "[A] chronic, remitting, relapsing, inflammatory, often febrile multisystemic disorder of connective tissue, acute or insidious in onset, characterized principally by involvement of the skin . . . joints, kidneys and serosal membranes."  Dorland's Illustrated Medical Dictionary 1032 (29th Ed. 2000).  The disorder is of unknown etiology, but is thought to represent a failure of regulatory mechanisms of the autoimmune system.  Id.

involvement.  (Tr. 270.)  Starting in January of 2000 and continuing through at least March of 2003,

she was treated for her connective tissue diseases by Dr. Annapurna Bhat (Dr. Bhat), a rheumatologist.

(Tr. 334-402, 465-70, 474, 476-91.)  Unfortunately, the majority of Dr. Bhat's treatment notes are

completely unreadable.  (Tr. 334, 337, 340, 345, 348, 351, 354, 356, 360-61, 364, 373, 377-79,

384-85, 387, 390, 392, 395, 399, 470, 476.)  On June 15, 2001, Dr. Bhat addressed a letter "To

Whom It May Concern" which stated that Ms. Robinson was being treated for lupus, rheumatoid

arthritis, Sjorgen's disease[3] and fibromyalgia.  (Tr. 376.)  A series of progress notes from November of

2002 through March of 2003, reveal findings of tenderness and synovitis[4] in Ms. Robinson's knees,

ankles, cervical spine, wrists, lumbar spine, shoulders and feet.  (Tr. 465-70, 474.)

Dr. Bhat completed an undated medical assessment questionnaire.  (Tr. 425-30.)  Dr. Bhat

opined that Ms. Robinson was unable to lift any weight; that she could stand or walk for only 30

minutes in an 8-hour workday; sit for one hour in an 8-hour workday; and that she was never able to

climb, balance, stoop, crouch, kneel or crawl.  (Tr. 425-26.)  Dr. Bhat also opined that Ms. Robinson

would need to alternate between sitting and standing, lie down during the day, elevate her legs during

the day, and have the ability to use bathroom facilities three times per day.  (Tr. 427.)  Dr. Bhat

indicated that Ms. Robinson's symptoms could reasonably be expected to cause more than four

absences from work per month.  (Id.)

_____

[3]     A symptom complex of unknown etiology, marked by the triad of keratoconjunctivitis
(inflammation of the cornea and conjunctiva), xerostomia (dryness of the mouth from salivary gland
dysfunction), and the presence of a connective tissue disease such as rheumatoid arthritis or systemic
lupus erythematosus.  Dorland's supra, at 939, 1650, 1767, 1992.

[4]     Inflammation of a synovium, which is painful on motion, and characterized by fluctuating
swelling.  Dorland's supra, at1773.

Ms. Robinson has had numerous surgeries. (Tr. 205.) In March of 2001, she underwent a total abdominal hysterectomy. (Tr. 205, 785-87.) Following the surgery she had a prolonged postoperative stay and developed anemia and chronic diarrhea. (Tr. 785-86, 823-25.) She was seen by Dr. Richard C. Prokesch, who opined that the diarrhea was probably antibiotic related. (Tr. 825.) In August of 2001, Ms. Robinson was seen by Dr. Hitesh R. Chokshi (Dr. Chokshi), for her ongoing diarrhea. (Tr. 804.) Ms. Robinson reported three bowel movements daily, usually in the morning, with fecal urgency. (Id.) Dr. Chokshi opined that her symptoms were most consistent with irritable bowel syndrome, but noted that she presented a newer complaint of band-like discomfort radiating up her sternum. (Tr. 806.) In September of 2001, Ms. Robinson underwent an endoscopy which revealed chronic gastritis. (Tr. 797.)

On November 5, 2001, Ms. Robinson underwent a consultative lupus evaluation conducted by Dr. Christian Ohagwu (Dr. Ohagwu). (Tr. 270-74.) Ms. Robinson reported that the most affected joints were her knees, shoulders and that small joints of the hands. (Tr. 270.) She indicated that the pain was sharp, would typically last for weeks at a time, and that her medications did not alleviate her pain. (Id.) Ms. Robinson stated that she could stand continuously for 10 minutes and sit for 30 minutes. (Id.) Dr. Ohagwu noted that she had smoked approximately half a pack of cigarettes for about 22 years, but that she had cut down to six cigarettes a day. (Tr. 271.) On examination, Dr. Ohagwu observed that Ms. Robinson appeared mildly obese and in no clinically apparent distress. (Id.) An examination of her joints revealed no redness, significant enlargement or warmth, but her knee joints exhibited bilateral synovial thickening. (Tr. 272.) Dr. Ohagwu also observed mild to moderate tenderness upon palpation of her right knee joint and mild, vague tenderness upon palpation of her

4

lumbosacral spine.  (Tr. 272-73.)  Ms. Robinson had difficulty squatting, and with heel/toe walking.

(Tr. 273.)   Dr. Ohagwu noted that Ms. Robinson was able to ambulate independently and efficiently.

(Id.)  Dr. Ohagwu concluded that if her "duties are structured to allow her enough sitting time and limit

lifting as well as very repetitive use of her extremities, she can still function for several hours in a usual 8-

hour work shift."  (Tr. 274.)

Starting in 2000, Ms. Robinson was seen by Dr. Eric Wooten (Dr. Wooten) for various

complaints including headaches, vertigo, lupus, sinus problems, dizziness, abdominal pains, edema,

pain, vaginal bleeding, diarrhea and glandular swelling.  (Tr. 529-52.)  Although not as difficult to

decipher as Dr. Bhat's treatment notes, Dr. Wooten's notes are also handwritten and difficult to read.

In December of 2001, Ms. Robinson reported feeling worse due to the pain from her lupus and

fibromyalgia.  (Tr. 523.)

In December of 2001, a state agency physician reviewed the medical record and concluded

that Ms. Robinson could lift 10 pounds occasionally and less than 10 pounds frequently; stand or walk

for two hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; and engage in limited

pushing/pulling with her arms along with gross manipulation.  (Tr. 291-98.)  In January of 2002, a

second state agency physician reviewed the record and concluded that Ms. Robinson could lift 20

pounds occasionally and 10 pounds frequently; stand or walk for 6 hours in an 8-hours workday; and

engage in unlimited pushing/pulling.  (Tr. 300-07.)

On April 10, 2002, Ms. Robinson underwent a consultative psychological evaluation conducted

by Steven C. Snook, Ph.D. (Dr. Snook).  (Tr. 317-19.)  Ms. Robinson stated that she was not under

any psychiatric care, nor had she ever received any mental health treatment.  (Tr. 317.)  Dr. Snook

noted that she did limited household chores, but that her daughter did most of the housework.  (Tr. 318.)  Ms. Robinson reported that she shopped for food, paid the bills and was actively involved in the care of her children.  (Id.)  She reported attending and socializing at church.  (Id.)  Dr. Snook observed that Ms. Robinson presented as alert, appropriately groomed and oriented to person, place, date and situation.  (Id.)  Ms. Robinson described herself as being somewhat depressed over her various illnesses, and complained of difficulty with sleep due to restlessness and pain.  (Tr. 318-19.)  Dr. Snook diagnosed Ms. Robinson with Depressive Disorder NOS, and assigned her a GAF score of 50.[5]  (Tr. 319.)  He observed that she was able to adequately maintain attention and sustain concentration during the evaluation, but noted that she may have some difficulty dealing with the general public or supervisors due to her pain.  (Id.)  Dr. Snook opined that her pain may also negatively affect her capacity to meet appropriate production norms.  (Id.)

In September of 2002, Ms. Robinson was evaluated at the Akstein Eye Center.  (Tr. 601-02.)  She complained that she was seeing spots and flashes, along with blurriness when watching television or reading.  (Tr. 601.)  Examination indicated retinal swelling and suspected glaucoma.  (Tr. 602.)  On October 3, 2002, she had cystic lesions removed from her eyes.  (Tr. 600.)  Several weeks later she reported blood drainage from her eyes with decreased vision, but no abnormalities were found on

---

[5]        The Global Assessment of Functioning scale is used to assess and individual's overall level of functioning.  Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000 Revision). The lower the score, the more serious the individual's symptoms.  Id.  GAF scores in the range of 41-50 indicate "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)."  Id. 34.

examination.  (Tr. 597, 599.)

On October 31, 2002, The Department of Veteran Affairs (VA) determined that Ms. Robinson was 100 percent disabled as a result of her rheumatoid arthritis, Sjorgen's disease, lupus and fibromyalgia.  (Tr. 493-94.)  The VA based its decision on an examination by Dr. S. Elam-Kootil (Dr. Elam-Kootil), letters from Dr. Bhat and treatment records regarding Ms. Robinson's eyes.  (Tr. 494.) The VA noted that "[a]n evaluation of 100 percent is granted whenever there is acute disease with frequent exacerbations producing severe impairment of health."  (Id.)  The VA established the effective date as August 16, 2001.  (Id.)

In November of 2002, Ms. Robinson complained of foot pain and intermittent swelling.  (Tr. 511.)  X-rays of her right foot showed prominent soft-tissue swelling and mild deformity and sclerosis in her big toe.  (Tr. 587.)

On April 14, 2003, Ms. Robinson returned to Dr. Chokshi, who noted abnormal liver enzymes. (Tr. 463.)  Dr. Chokshi observed that Ms. Robinson appeared tired and exhibited diffuse tenderness and trace edema.  (Tr. 463.)

On July 22, 2003, shortly after moving to Minnesota, Ms. Robinson presented at Fairview Ridges Emergency Room where she was seen by Dr. Steven T. Tvedte (Dr. Tvetdte).  (Tr. 634-37.) Ms. Robinson complained of increasing joint pain over the previous several weeks.  (Tr. 634.)  Ms. Robinson reported pain from her head to her feet without isolating any specific joints as spared from pain.  (Id.)  On physical examination Dr. Tvetde observed that Ms. Robinson appeared chronically ill, but that there was no obvious joint deformity, swelling, warmth or redness.  (Tr. 635.)  Dr. Tvetde noted that Ms. Robinson had yet to establish a primary care physician, but that she had an appointment

scheduled shortly thereafter.  (Tr. 634.)  Dr. Tvetde agreed to refill Ms. Robinson's prescriptions for

Percocet and Ambien, pending her upcoming appointment, and he gave her shots of Demerol and

Vistaril for immediate pain control.  (Id.)

On July 28, 2003, Ms. Robinson was seen by Dr. Krishna Pellagar (Dr. Pellagar) in order to

establish primary care.  (Tr. 638.)  Dr. Pellagar observed that Ms. Robinson appeared healthy, alert

and in no distress.  (Tr. 639.)  Dr. Pellagar referred Ms. Robinson for testing and informed her that he

would decide on her medications after receiving the results.  (Tr. 640.)  On July 31, 2003, Dr. Pellagar

noted that Ms. Robinson had elevated liver enzymes.  (Tr. 640.)  Dr. Pellagar diagnosed Ms. Robinson

with systemic lupus erythematosus, fibromyalgia, sarcoidosis, rheumatoid arthritis, and headache.  (Tr.

640-41.)

On September 9, 2003, Ms. Robinson was evaluated by Dr. Rajiv Aggarwal (Dr. Aggarwal)

for migraine headaches.  (Tr. 447-50.)  She described her headaches as a tight band-like sensation

with some throbbing pain and nausea, photophobia and phonophobia.  (Tr. 447.)  Dr. Aggarwal noted

an extensive list of medications.  (Id.)  Dr. Aggarwal observed that Ms. Robinson was neurologically

intact, but that she exhibited "multiple myofascial tender points involving the occipital, trapezius,

sternocleidomastoid, sternal, scapular, elbow, knee, and low back areas bilaterally."  (Tr. 448.)  Dr.

Aggarwal assessed Ms. Robinson with migraines.  (Tr. 449.)  He also observed that she exhibited

features of chronic pain disorder and fibromyalgia and encouraged her to follow up with rheumatology

and a pain clinic.  (Id.)

On November 6, 2003, Ms. Robinson was evaluated at the Minnesota Sleep Center by Dr.

Kathy R. Gromer (Dr. Gromer) on referral from Dr. Pallegar.  (Tr. 440-41.)  Dr. Gromer noted that

Ms. Robinson had begun falling asleep standing up.  (Tr. 440.)  She was assisted at the clinic by her husband and her daughter.  (Id.)  Dr. Gromer noted Ms. Robinson's extensive medications as well as her past medical history.  (Tr. 440-41.)  Plaintiff's husband and daughter reported that Ms. Robinson slept all day and night, and when she was not in bed she would doze in a chair in either the family room or kitchen.  (Tr. 441.)  Dr. Gromer indicated that Ms. Robinson needed a sleep study, but also suspected that polypharmacy was at the root of her problems and recommended that she cut back on her sedative medication as much as possible.  (Id.)

On December 2, 2003, Ms. Robinson returned to Dr. Gromer, who noted that she was improved over her previous visit, but that she fell asleep whenever she stopped talking.  (Tr. 431-32.) Dr. Gromer noted that she fell asleep and snored in the middle of taking a paper out of her purse.  (Tr. 431.)  Ms. Robinson related that her pain had been severe and she had been unable to sleep well for the previous two nights.  (Id.)  Dr. Gromer related that her sleep study revealed severe sleep apnea. (Id.)  Dr. Gromer recommended that Ms. Robinson cut her medications.  (Tr. 432.)

On February 7, 2004, Ms. Robinson was seen by Dr. Michael P. Rock (Dr. Rock) at Fairview Ridges, for complaints of headache.  (Tr. 892.)  Dr. Rock noted that review of systems was panpositive in that nearly every question asked, Ms. Robinson stated that she currently had the symptom.  (Id.)  Dr. Rock questioned the reliability of the review.  (Id.)  Dr. Rock noted that Ms. Robinson clearly had a chronic pain syndrome and difficult pain control issue.  (Id.)  Dr. Rock observed that Ms. Robinson was hyperventilating and appeared to be in the midst of a panic attack. (Tr. 892-93.)

On March 8, 2004, Ms. Robinson underwent a consultative pain management evaluation

conducted by Barbara St. Marie and Georgia Panopoulos, Ph.D. (Dr. Panopoulos).  (Tr. 903-12.)

Ms. Robinson indicated that she experienced some depression and anxiety, but that what bothered her

most was her pain.  (Tr. 905.)  Ms. Robinson presented with "all over body pain" which she described

as daily and constant.  (Tr. 909.)  Ms. Robinson reported "complete, almost catastrophic, impact

secondary to pain."  (Id.)  Dr. Panopoulos noted that she used to be very functional.  (Id.)  Ms.

Robinson reported sleeping only three hours per night, feeling down and having a loss of energy.  (Tr.

910.)  Dr. Panopoulos noted that she had a home care nurse.  (Id.)  Dr. Panopoulos observed that Ms.

Robinson's mood was depressed and her affect was blunted, and at times flat.  (Tr. 911.)  Her

attention and concentration were difficult to assess, but it was noted that with a number of questions,

Ms. Robinson was slow to respond or unable to respond.  (Id.)  Dr. Panopoulos diagnosed Ms.

Robinson with pain disorder with psychological features and assigned her a current GAF of 40 to 45.

(Tr. 912.)  Dr. Panopoulos recommended further pain management treatment planning.  (Id.)

### B.    Ms. Robinson's Background and Hearing Testimony

At the time of the hearing, Ms. Robinson was 43 years old, married and had three children,

ages 18, 10 and 8, living at home.  (Tr. 47, 144-45).  She has a high school diploma and one year of

schooling after high school.  (Tr. 46.)  Ms. Robinson has past relevant work experience as an office

manager, clerk, cashier and janitor, with the bulk of her work experience in a general clerical position in

the United States Army.  (Tr. 28, 30, 44, 172).  Ms. Robinson stated that she received training in

business administration and finance while in the military.  (Tr. 46.)  Ms. Robinson testified that she went

off active military duty in June of 1999, in part because she was not able to give 100 percent.  (Tr. 39,

44.)  After leaving military service, Ms. Robinson indicated that she was not able to look for work due

to the fatigue and severe pain she suffered as a result of her lupus and fibromyalgia.[6]  (Tr. 43).

Ms. Robinson stated that both the fatigue and the pain she suffered were bad, but that if she could get rid of one of them, she would get rid of the fatigue.  (Tr. 55-56.)  When asked how much time she needed to sleep and rest due to her fatigue, Ms. Robinson replied: "I really just need my eight hours during the night."  (Tr. 56.)  Ms. Robinson testified that she tried to rest during the day so that she would have energy to spend time with her boys when they came home from school.  (Id.)  Ms. Robinson testified that she needed to lay down during a typical day or else she would experience extra pain, fatigue and stress.  (Tr. 58.)  Ms. Robinson stated that she would watch television with her children to be "in the room with them" but that she was unable to concentrate on the shows.  (Tr. 65.)

When asked where she experienced pain, Ms. Robinson replied: "All over, my joints, my stomach, my back, my hips, my knees, my ankles . . . my elbow areas."  (Tr. 71-72.)  She described her pain as always present, at times worse than others.  (Tr. 72.)  Ms. Robinson testified that: "some days, I can wake up and it can be at a low level and some nights or days, I can wake up and I'm in the most excruciating pain that you can ever be in and it lasts all day long, it lasts for days, it lasts for weeks."  (Id.)  She estimated that she was in a high level of pain about 30 percent of the time.  (Tr. 72-73.)  Ms. Robinson testified that stress exacerbated her symptoms, and that she experienced a lot of stress dealing with her son who has ADHD.  (Tr. 70.)

Ms. Robinson testified that she had ongoing problems with diarrhea on a weekly basis.  (Tr.

---

[6]     Ms. Robinson did work part-time managing a beauty salon from October of 1999 through March of 2001.  (Tr. 74, 172.)  Her husband testified that the owner of the salon knew that Ms. Robinson was having problems and allowed her to work her own hours.  (Tr. 81.)

75.)  She estimated that she experienced diarrhea three days out of the week, and that on those days she would have loose stools four times a day.  (Tr. 75-76.)  Ms. Robinson stated that each bathroom trip took a long time, because she need to make sure she was finished.  (Tr. 77.)  Ms. Robinson related that she had "accidents" a couple of times.  (Id.)  Ms. Robinson listed additional symptoms, as a result of Sjogren's disease, including problems producing saliva and drying of mucous membranes.  (Tr. 88.)  She also indicated that her vision was getting worse.  (Id.)

Ms. Robinson stated that she had not driven since moving to Minnesota, due to the medications, fatigue, soreness and her reflexes.  (Tr. 46.)  Ms. Robinson stated that she smoked about four cigarettes a day.  (Id.)  Although not prescribed by a doctor, Ms. Robinson indicated that she had used a cane to help with support for approximately a year prior to the hearing.  (Tr. 47-48.)  Ms. Robinson stated that she had fallen quite a few times.  (Tr. 49.)  Ms. Robinson testified that she was able to bathe and feed herself, but that her husband or her daughter fix meals.  (Tr. 53.)  She stated that unless she had an appointment she did not get dressed, instead wearing a house gown because it took a lot of energy to get dressed.  (Tr. 59.)  Ms. Robinson testified that it had been her practice to attend church twice a week, but that since moving to Minnesota she had only attended twice in six months because she had "been very sick."  (Tr. 77.)

Ms. Robinson stated that sometimes her ability to stand was limited by pains in her ankles, knees and thighs.  (Tr. 61.)  She estimated that she could probably stand for 15-20 minutes on a good day, but no more than 5 minutes on a bad day.  (Id.)  She stated that she could sit for about 20 minutes on a good day before getting irritated, but no more than 5 minutes on a bad day.  (Tr. 61-62.)  Ms. Robinson stated that she tried to walk around the cul-de-sac where she lived, but that on a bad day she

was unable to walk at all.  (Tr. 63.)  She estimated that she could lift a 12-pack of soda.  (Id.)  Ms. Robinson testified that she exercised with her daughter for approximately 20 minutes a day, but that it caused her pain.  (Tr. 65.)

Ms. Robinson testified that she experienced "a lot of anxiety" and that she would "get depressed sometimes."  (Tr. 66.)  She stated that her anxiety interfered with her ability to concentrate and her ability to do things around the house.  (Id.)  Ms. Robinson stated: "I can't concentrate at all and I can't think.  The only thing I can do is mostly just cry."  (Tr. 67.)   Ms. Robinson estimated that she experienced such anxiety once or twice a month and that it would last for a couple of days.  (Id.)  Ms. Robinson testified that she was depressed by the fact that they did not have family in Minnesota, and described her symptoms as feeling sad and not having a lot of energy.  (Tr. 69.)  Ms. Robinson stated that her depression did not interfere with her concentration.  (Id.)  When asked if her medications interfered with her ability to concentrate, Ms. Robinson replied that they did.  (Tr. 78.)  She testified that she was unable to follow a recipe, but that on good days she was able to read a book for about 20 minutes.  (Tr. 78-79.)

### C.      Herman Robinson's Testimony

Herman Robinson, plaintiff's husband, appeared and testified at the hearing.  (Tr. 80.)  Herman Robinson testified that he worked for the military as an assistant to a Chaplain.  (Tr. 82.)  He stated that he first noticed his wife having problems with her health while she was in the military in 1998.  (Tr. 80.)  He testified that he sensed her health was getting worse in 1999 when she left the military.  (Tr. 81.)  Herman Robinson described his wife as exhibiting "a lot of fatigue, tiredness, not able to do sort of things around the house and stuff like that."  (Id.)  He stated that he believed her condition had gotten

worse since she had stopped working in 2001.  (Tr. 82.)  He stated that his wife spent most of her days

resting, and that he tried to help to exercise because he did not "want her to stay in the bed too much."

(Tr. 86.)  He also testified that he was allowed some flexibility in his work in order to help out his wife,

and that their daughter, who was scheduled to return to Georgia for college in June of 2004, had

traveled to Minnesota with them in order to also assist.  (Tr. 83-85.)

>    **D.**    **The Medical Expert's Testimony**

Dr. John LaBree (Dr. LaBree) appeared and testified as a neutral medical expert.  (Tr. 89.)

Dr. LaBree stated that it was "a very complex situation[.]"  (Id.)  He noted that Ms. Robinson had a

history suggesting lupus with elevated antibodies in 2001, but that they were currently normal.  (Id.)  He

noted that she did still have "some elevation in her sugar, its antibodies."  (Id.)  Dr. LaBree testified that

in order to meet the listings, there needed to be evidence of:

> Some end organ damage and her exam have not shown evidence of joint disease.  She
> has a complaint of chronic pain in the joints but exams do not show any swelling or
> thickening or any other enlargement or warmth of the joints and there's  several
> examiners who have made this observation . . . where there's no obvious joint
> abnormality.  There's no evidence of renal or cardiovascular plural or any other
> evidence or even logical that would support a clinical diagnosis of - - or an objective
> evidence of lupus.  Oh, it's possible that you can have lupus without symptoms, of joint
> and so forth.  Usually that's considered to be fatigue but you need a couple of other
> findings to make the diagnosis complete.

(Id.)  Dr. LaBree noted that Ms. Robinson had some liver function abnormalities but during a recent

visit to the VA her liver function tests were normal.  (Tr. 90.)

Dr. LaBree opined that Ms. Robinson's major problem was severe pain, without objective

evidence of systemic lupus or rheumatoid arthritis.  (Id.)  He also noted that there was a question of

fatigue, and a problem of poly-pharmacy.  (Id.)  Dr. LaBree reiterated that it was a very complex

situation, with the major problem being chronic pain.  (Id.)

Dr. LaBree testified that Ms. Robinson did not meet or equal any of the listings based on the objective findings.  (Tr. 91.)  He assessed her with a sedentary RFC, noting that she would have a lot of problems functioning with the chronic pain.  (Id.)  Under questioning from Ms. Robinson's attorney, Dr. LaBree agreed that the chronic pain would interfere with Ms. Robinson's ability to work full time.  (Id.)  Dr. LaBree stated that Ms. Robinson, at her best, would have difficulty being at work and sustaining work activity.  (Id.)

Ms. Robinson's attorney questioned Dr. LaBree about charts from Dr. Bhat's treatment notes which seemed to indicate problems with swelling and thickening.  (Tr. 92.)  Dr. LaBree agreed that there did appear to be such findings, but noted that they were very difficult to read.  (Tr. 92-93.)  Dr. LaBree stated that he did not find support "except from Dr. [Bhat]."  (Tr. 93.)  Under further questioning, Dr. LaBree agreed that Ms. Robinson had been diagnosed with fibromyalgia, but that "no joints were swollen, red or limited in the range of motion and there were no tender points."  (Tr. 93-94.)  Dr. LaBree stated that he thought there were somatoform problems.  (Tr. 94.)

### E.    The Vocational Expert's Testimony

Mary Harris appeared and testified as a neutral vocational expert.  (Tr. 95.)  The ALJ asked Ms. Harris to consider a hypothetical individual of Ms. Robinson's age, educational history, work history and history of medical conditions.  (Tr. 96-97.)  The ALJ assigned the hypothetical individual a sedentary RFC and asked Ms. Harris whether such an individual could perform any of Ms. Robinson's past work, to which Ms. Harris replied that "the clerk position would apply to that hypothetical."  (Tr. 97.)  The ALJ then added further restrictions including a sit/stand option, sitting up to 20 minutes at a

time and standing up to 20 minutes at a time.  (Tr. 98.)  Ms. Harris responded that there would be

75,000-85,000 general clerical jobs which would fit the hypothetical.  (Tr. 98.)

The ALJ then asked Ms. Harris to consider further restrictions including no climbing, balancing,

only occasional stooping, and no work with unprotected, dangerous machines or high concentrations of

chemicals.  (Tr. 98-99.)  Ms. Harris responded that there would still be at least 20,000 jobs available.

(Tr. 99.)  Finally the ALJ asked Ms. Harris to consider the additional limitation of needing to have a leg

elevated to the level of sitting height.  (Id.)  Ms. Harris responded that it would depend on how long

elevation was required.  (Id.)  If the hypothetical needed to have her leg elevated for the majority of the

day then clerical work might be a problem, but receptionist work was still an option.  (Id.)

Ms. Robinson's attorney asked Ms. Harris to consider that the hypothetical individual was

limited to frequent lifting and carrying of one pound, with no repetitive activities of her arms, and

carrying small items, such as files or ledgers, less than 1/3 of a day.  (Tr. 99-100.)  Ms. Harris

responded that there would still be 2,000-3,000 clerical jobs available.  (Tr. 100.)  Ms. Robinson's

attorney added difficulties coping and dealing with the general public and supervisors, along with

difficulties meeting appropriate production norms.  (Tr. 101.)  Ms. Harris stated that such restrictions

would eliminate competitive employment.  (Id.)  Ms. Robinson's attorney presented a final hypothetical,

in which the individual would need more than three fifteen minute breaks a day on a regular basis.  (Tr.

101-02.)  Ms. Harris testified that although some employers were more liberal than others in such

respects, the general rule would preclude competitive employment.  (Tr. 102.)

## IV.    THE ALJ'S DECISION

The Social Security Administration has adopted regulations requiring the ALJ to make a series

of factual findings regarding the claimant's work history, impairment, residual functional capacity (RFC),[7] past work, age, education and work experience when determining the existence and extent of a claimant's disability.  See 20 C.F.R. §§ 404.1520, 416.920; see also Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  The Eighth Circuit described this five-step process in Fines v. Apfel:

> The Commissioner must determine: (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment--one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

149 F.3d 893, 894 -95 (8th Cir. 1998).

In addition, if the claimant has a medically determined mental impairment under the "A" criteria, the ALJ must proceed through the additional steps outlined in 20 C.F.R. § 404.1520a, which requires that the ALJ evaluate the claimant's degree of limitation in four broad functional areas, also known as the "B" criteria.  See 20 C.F.R. Part 404, Subpt. P, App. 1.  These four areas are: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).  The ALJ must rate the degree of limitation on a scale of: none, mild, moderate, marked or extreme.  § 404.1520a(c)(4).  If by such evaluation the ALJ determines that an impairment is severe, but does not meet a listed impairment, the ALJ must assess the claimant's RFC

---

[7]      A claimant's RFC is the most the claimant can still do despite the claimant's physical and or mental limitations.  20 C.F.R. § 404.1545.

as described in step four of the determination procedure.  § 404.1520(d)(3).

When evaluating a claimant's RFC, the ALJ must consider the credibility of claimant's subjective complaints.  In making the credibility determination, the ALJ must consider the factors set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).  The factors include: daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions.  Id. at 1322.

The ALJ issued a decision on July 19, 2004, denying Ms. Robinson's application for DIB.  (Tr. 30.)  At the first step, the ALJ determined that Ms. Robinson had not engaged in substantial gainful activity since March 2, 2001.  (Tr. 19.)  At the second step, the ALJ determined that she was severely impaired by: a history of headaches; hypertension; a history of bursitis in the right hip; lupus; connective tissue disease; fibromyalgia; Sjorgen's disease; hysterectomy; gastritis; allergic rhinitis; minimal arthritis of the knees; chronic pain syndrome; sleep apnea and poly-pharmaceutical use with over 30 medications listed.  (Id.)

The ALJ also found that the record indicated diagnoses of the mental impairments including anxiety, depressive disorder and pain disorder.  (Tr. 21.)  The ALJ thus evaluated Ms. Robinson's degree of limitation under the "B" criteria.  (Tr. 21-22.)  The ALJ found that Ms. Robinson suffered no more that mild restrictions in her activities of daily living, social functioning, and in concentration, persistence and pace.  (Tr. 22.)  The ALJ found no episodes of decompensation.  (Id.)  The ALJ concluded that Ms. Robinson's mental impairments were not severe.  (Id.)

The ALJ thus considered whether any of Ms. Robinson's severe impairments met or medically equaled any Listing.  (Id.)  Based on the testimony of Dr. LaBree, the ALJ found that the medical

evidence did not show that the severity of Ms. Robinson's impairments, either individually or in

combination, met or medically equaled the requirements of any impairment listed in 20 C.F.R. Part

404, Subpt. P, App. 1.  (Id.)

The ALJ turned to a determination of Ms. Robinson's RFC.  (Tr. 23-28.)  The ALJ found that

Ms. Robinson retained the RFC to engage in sedentary work with ready access to a bathroom.  (Tr.

24.)  The ALJ acknowledged Dr. Bhat's RFC assessment, the limitations of which would preclude

Ms. Robinson from competitive employment, but accorded her opinion little weight.  (Id.)  The ALJ

acknowledged that Dr. Bhat was a treating medical source, whose opinion is normally accorded great

weight, and that she was a specialist in her field.  (Tr. 25.)  The ALJ nevertheless found that Dr. Bhat's

opinion was unsupported by the objective medical evidence in the record and was inconsistent with

other substantial evidence.  (Tr. 24-25.)  The ALJ remarked that:

> The possibility always exists that a doctor may express an opinion in an effort to assist
> a patient with whom he or she sympathizes for one reason or another.  Another reality
> which should be mentioned is that patients can be quite insistent and demanding in
> seeking supportive notes or reports from their physicians, who might provide such a
> note in order to satisfy their patient's request and avoid unnecessary doctor/patient
> tension.

(Tr. 25.)  The ALJ noted that it was difficult to confirm the presence of such motives, but that "they are

more likely in situations where the opinion in question departs substantially from the rest of the evidence

of record, as in the current case."  (Id.)

The ALJ noted that x-rays of Ms. Robinson's lumbar spine, hips and neck in 2001 were

normal, although later x-rays indicated mild osteoarthritis in her knees.  (Tr. 24.)  The ALJ noted that

D. Aggarwal found that neurological examination and testing of Ms. Robinson was normal.  (Id.)  The

ALJ also noted that Dr. Chokshi's note from October of 2002, indicated that Ms. Robinson's extremities showed no cyanosis, clubbing or edema, and her other examinations were unremarkable. (Tr. 24-25.)  The ALJ found Ms. Robinson's presentation to Dr. Rock in February of 2004, and the description of the severity of her pain to be "so extreme as to appear implausible."  (Tr. 25.)  The ALJ accepted Dr. LaBree's testimony that the medical record does not support a lupus diagnosis, but does show that Ms. Robinson is overmedicated.  (Tr. 26-27.)  The ALJ, however, rejected Dr. LaBree's testimony that Ms. Robinson may have problems sustaining full time employment.  (Tr. 26.)  The ALJ also looked to the consultative examination of Dr. Ohagwu, pointing out that while Ms. Robinson exhibited generalized body pain, there were no significant trigger point findings.  (Tr. 28.)  The ALJ characterized Dr. Ohagwu as opining that Ms. Robinson should be able to sustain work during an eight hour shift.  (Id.)  The ALJ gave great weight to the opinion of Dr. Ohagwu because it was "based on clinical evaluation and diagnostic tests."  (Id.)  Finally, the ALJ found that the opinions of the state agency doctors supported a sedentary RFC.  (Id.)  The ALJ acknowledged that Ms. Robinson was considered disabled by the VA, but dismissed the determination, stating: "The criteria and standards for disability under the Veteran's administration is not the same as the standards under the Social Security Administration.  Consequently, the undersigned is not persuaded to reduce the [RFC], further."  (Tr. 27.)

The ALJ also considered the credibility of Ms. Robinson's subjective complaints finding her testimony inconsistent with the objective record and not credible to the extent that she is restricted by her impairments beyond the sedentary level.  (Tr. 23, 26-28.)  The ALJ found that Ms. Robinson was able to manage her household, watch her young children, read, shop, and watch television programs, all

of which require good concentration and attention.  (Tr. 26.)  The ALJ also found Ms. Robinson's

credibility diminished because she continued to smoke cigarettes despite having rhinitis, sinus problems

and sleep apnea, all of which he surmised might be related to a history of smoking.  (Tr. 27.)  The ALJ

found that her treatment with medication had been helpful, stating that "[t]he objective medical record

indicates that treatment with medication has been helpful in controlling many of the symptoms."  (Id.)

The ALJ also found that "[t]he record generally suggests that the claimant was seeing physicians

primarily in order to generate evidence for this application."[8]  (Id.)  The ALJ noted that during

numerous emergency room visits, physical examinations were unremarkable.  (Id.)  The ALJ finally

noted that Ms. Robinson had been observed at a Social Security field office as friendly, cooperative,

well groomed and demonstrating no pain behaviors.  (Id.)

Based on his RFC determination and the testimony of the Vocational Expert, the ALJ found

that Ms. Robinson was capable of performing her past work in general clerical.  (Tr. 28.)  In the

alternative, he noted that even with a reduced RFC which included a sit/stand option every twenty

minutes, there would still be a large number of jobs.  (Tr. 28-29.)  Even further limited to only lifting and

carrying one pound with no repetitive movement, the ALJ found there would still be 2000-3000 jobs

Ms. Robinson could perform.  (Tr. 29.)  The ALJ thus found that Ms. Robinson was not under a

disability as defined in the Social Security Act at any time through the date of decision.  (Id.)

## V.   DISCUSSION

### A.   Standard of Review

---

[8]     The ALJ does not cite to the record or otherwise explain how he arrived at such a
conclusion.

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)); Haley v. Massanari, 258 F.3d 742, 747 (8th 2001).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  Id.  In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"  Id. (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  See Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.  Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding).  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability insurance benefits

under the Social Security Act.  See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928

F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated he or she cannot perform prior

work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant

can engage in some other substantial, gainful activity.  Martonik v. Heckler, 773 F.2d 236, 238 (8th

Cir. 1985).

### B.      Analysis of the ALJ's Decision

In this case, plaintiff asserts that the ALJ committed two basic errors during the course of the

five-step disability evaluation process.  First, she contends that the ALJ failed to accord proper weight

to the opinion of Dr. Bhat and incorrectly found her mental impairment to be non-severe.  Second, she

contends that the ALJ improperly discounted her subjective complaints.  Plaintiff claims that as a result

of these errors, the ALJ improperly concluded that she could perform a range of sedentary work, and

that she was still able to perform her past relevant work in general clerical.

The Court agrees with plaintiff that the ALJ's RFC determination – i.e., that plaintiff is capable

of a range of sedentary work – is not sustainable.  The Court finds, for reasons discussed below, that

the fundamental problem with the ALJ's decision is that he simply did not have sufficient medical

evidence to make a well-informed decision about plaintiff's RFC.  Therefore, the Court concludes that

this case must be remanded for further development of the record.[9]

### 1.      The ALJ's Duty to Develop the Record

---

[9]      Plaintiff's arguments pertaining to the assessment of Dr. Bhat's opinion, the severity of her mental impairments and her subjective complaints will not be specifically addressed here, because the ALJ will undoubtedly have to reconsider those matters in light of the more complete medical record to be developed on remand.

Social Security hearings are administrative hearings and are not adversarial.  Cox v. Apfel, 160 F.3d 1203, 1209 (8th Cir. 1998).  The ALJ, on behalf of the Commissioner, has the duty to fully and fairly develop the facts of the case.  Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002).  This is true even where a claimant is represented by counsel.  See Bishop v. Sullivan, 900 F.2d 1259, 1262 (8th Cir. 1990).  The ALJ's duty "includes, at the very least, ensuring . . . an appellate record that is readable by supplementing the record through additional testimony or exhibits where necessary." Forehand v. Barnhart, 364 F.3d 984, 987 n.1 (8th Cir. 2004).

The ALJ is not required to seek additional clarifying statements or exhibits unless a crucial issue is undeveloped.  Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005).  The regulations provide that supplementing the record is necessary in cases where the evidence received from a treating source is inadequate to determine whether the claimant is disabled.  20 C.F.R. § 404.1512(e).  If such a situation arises, the ALJ should first attempt to contact the treating source, but if the information is not readily available, a consultative examination should be scheduled.  See Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992) (holding that it is reversible error for an ALJ not to obtain a consultative examination if such an examination is necessary to make an informed decision).

The duty to fully develop the record is not satisfied by merely having the claimant's medical records reviewed by a medical consultant.  There must be adequate relevant medical evidence generated by a medical expert who has actually examined the claimant and not just the claimant's records.  Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  If the medical experts who have examined the claimant have not provided sufficient information to make a well-informed assessment of the claimant's impairments and RFC, then the ALJ must make suitable arrangements to obtain such

24

information before deciding whether the claimant is disabled.  Id.

### 2.      The Adequacy of Plaintiff's Medical Records in this Case

In this case, the medical records do not provide enough information to properly assess Ms.

Robinson's impairments, particularly her physical impairments, and her resulting RFC.  The ALJ

recognized that Ms. Robinson was severely impaired by, *inter alia*, lupus, connective tissue disease,

Sjorgen's disease and fibromyalgia.  (Tr. 19.)  Having made that threshold determination, the ALJ was

tasked with determining the extent to which those impairments actually limited Ms. Robinson's RFC

and her ability to work.  At the core of that determination is the treatment history and RFC opinion of

Dr. Bhat.

Despite the relatively large overall volume of records from Dr. Bhat's treatment relationship

with Ms. Robinson, there is very little evidence which sheds any meaningful light on her RFC opinion.

The treatment notes of Dr. Bhat are essentially unreadable, and without such notes it is impossible to

place her RFC assessment in context.  The ALJ rejected her opinion as unsupported by objective

evidence or diagnostic testing, but it remains an open question as to how he reached such a conclusion

without the benefit of Dr. Bhat's underlying treatment history.

The ALJ agreed with the testimony of Dr. LaBree that the medical record does not support a

lupus diagnosis, but Dr. LaBree's testimony is based on the same flawed record.  Dr. LaBree was

likewise deprived of the underlying treatment history between Dr. Bhat and Ms. Robinson.

Furthermore, his testimony seems to indicate that he may have overlooked some objective

findings by Dr. Bhat and other doctors supporting a diagnosis of lupus.  Under questioning from the

ALJ, Dr. LaBree testified that "exams do not show any swelling or thickening or any other enlargement

of the joints . . . ."  (Tr. 89.)  However, when questioned by Ms. Robinson's attorney, Dr. LaBree

agreed that there were some records indicating problems with swelling and thickening, but he stated

that they were hard to read.  (Tr. 92.)  Dr. LaBree stated further that he did not find any support except

from Dr. Bhat.  (Id.)  In fact, the medical record reveals other objective evidence indicating problems

with swelling and thickening.  For example, Dr. Ohagwu noted synovial thickening in Ms. Robinson's

knees, and x-rays revealed soft-tissue swelling and mild deformity in her big toe.[10]  (Tr. 272, 587.)

   The ALJ accorded great weight to the assessment of Dr. Ohagwu, who conducted a

consultative examination.  (Tr. 28.)  The ALJ assigned such weight because Dr. Ohagwu's opinion was

"based on clinical evaluation and diagnostic tests."  (Id.)  The ALJ went on to characterize Dr. Ohagwu

as opining that Ms. Robinson "should be able to sustain work during an eight hour shift and her duties

should be structured to allow her enough sitting time and limited lifting."  (Id.)  The ALJ, however,

misreads and mischaracterizes Dr. Ohagwu's opinion.  Dr. Ohagwu actually opined that: "If the

claimant's duties are structured to allow her enough sitting time and limit lifting as well as very repetitive

use of her extremities, she can still function for several hours in a usual 8-hour work shift."  (Tr. 274.)

Omitted from the ALJ's characterization is Dr. Ohagwu's reference to an ability to function for several

hours in an 8-hour shift.  It is not entirely clear to the Court what Dr. Ohagwu meant by this, but the

perhaps the most rational interpretation is that Ms. Robinson would only be able to work for several

hours out of a typical 8-hour day.

---

   [10]   Dr. LaBree appears to have made a similar mistake when testifying regarding Ms.
Robinson's diagnosis of fibromyalgia.  Dr. LaBree stated that there were no objective findings,
including tender points, to support such a diagnosis.  (Tr. 93-94.)  However, Dr. Aggarwal observed
"multiple myofascial tender points . . . ."  (Tr. 448.)

It is a simple fact that Dr. Bhat had a significant treating relationship with Ms. Robinson and her opinion goes to the heart of Ms. Robinson's claim.  It may well be that Dr. Bhat's opinion is unsupported by objective medical evidence and inconsistent with other substantial evidence in the record, but the ALJ must make that determination based on more than just mere conjecture.[11]  Ms. Robinson's treatment history with Dr. Bhat is precisely the type of crucial issue that the ALJ has a duty to fully develop before making an informed decision as to the extent and limitations of Ms. Robinson's impairments.  See Goff, 421 F.3d at 791.

### 3.    Remand is Required

The Court recommends that Ms. Robinson's Motion for Summary Judgment be granted in part and denied in part.  Her request for an order vacating the ALJ's decision and a remand for further proceedings should be granted, but her request for an immediate award of benefits should be denied.  It is also recommended that the Commissioner's Motion for Summary Judgment be denied.  On remand, the ALJ should take appropriate steps to ensure that the record includes sufficient medical information to accurately assess the true nature and extent of all of Ms. Robinson's exertional and non-exertional limitations.  The ALJ will have to solicit further medical information from Ms. Robinson's treating

---

[11]    The Court notes that the ALJ also appears to have resorted to speculation in intimating that Dr. Bhat rendered her RFC opinion due to pressure from Ms. Robinson or because she felt sorry for Ms. Robinson.  The ALJ does not cite to the record to support such speculation, nor does he provide any further reasoning for such speculation.  Likewise, the ALJ concludes that Ms. Robinson was seeing physicians primarily in order to generate evidence to support her claims.  Again, the ALJ completely fails to cite to the record or otherwise support his conclusion.  On remand, the ALJ should be mindful that it is error to improperly speculate or otherwise draw his own inferences from medical reports, especially where such inferences are entirely unexplained.  See DiMasse v. Barnhart, 88 Fed.Appx. 956, 957 (8th Cir. 2004); see also Pettit v. Apfel, 218 F.3d 901, 903-04 (8th Cir. 2000) (holding insufficient ALJ's findings, where the ALJ failed to explain how he reached his findings).

physicians, from some other expert medical consultant who has examined Ms. Robinson, or both.  The

ALJ must make sure that there is sufficient medical evidence to make an accurate assessment of her

RFC.

If the ALJ still believes, after considering the new, fully-developed medical record, that the

treating physicians' opinions and Ms. Robinson's subjective complaints should be discounted, he will

have to explain his position on those matters in light of the new record.  Finally, the ALJ will have to

reconsider his final RFC determination in light of the new medical record.  If the ALJ revises his final

RFC determination, he will then have to solicit new testimony from a vocational expert in order to

determine whether Ms. Robinson can still perform her past relevant work, or whether, at step five of

the evaluation process, there are any other jobs that she could perform given the ALJ's post-remand

RFC determination.  See Nevland, 204 F.3d at 858 (where a vocational expert's opinion is predicated

on a faulty RFC determination, the ALJ cannot rely on that opinion).

As previously noted, the Court will not presently reach Ms. Robinson's claims that the ALJ

improperly weighed the medical evidence, and wrongly rejected her subjective complaints.  Because

the record needs to be further developed, it would merely be an academic exercise to speculate on the

merits of those issues.

**VI.     RECOMMENDATION**

For the foregoing reasons, this Court recommends that:

1)      Ms. Robinson's Motion for Summary Judgment [Docket No. 6], be **GRANTED** in

part and **DENIED** in part;

2)      The Commissioner's Motion for Summary Judgment [Docket No. 14], be **DENIED**;

28

and

     3)     The decision of the ALJ be vacate and the case remanded to the Commissioner for

further proceedings consistent with this Report and Recommendation.

Dated:   <u>February 2, 2006</u>

<u> s/Arthur J. Boylan        </u>
Arthur J. Boylan
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **February 16, 2006**.